| | |
|---|---|
| **DISTRICT COURT, EL PASO COUNTY STATE OF COLORADO**<br>270 S. Tejon Street<br>Colorado Springs, CO 80903<br>Phone: 719-452-5000 | DATE FILED: August 19, 2020 4:09 PM<br>FILING ID: 8A6374F2BCE03<br>CASE NUMBER: 2020CV31476 |
| **Plaintiff:**<br><br>NICOLE CLEVELAND, Individually and as Personal Representative of the Estate of Decedent William Perry<br><br>v.<br><br>**Defendants:**<br><br>SSC COLORADO SPRINGS ASPEN OPERATING COMPANY LLC t/a ASPEN LIVING CENTER, a Delaware Corporation<br><br>and<br><br>SAVA SENIORCARE ADMINISTRATIVE SERVICES LLC, a Delaware Corporation<br><br>and<br><br>SAVA SENIORCARE CONSULTING, LLC, a Delaware Corporation | <br><br>▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>Ken Falkenstein, Esq., Reg. No. 52307<br>IRWIN FRALEY, PLLC<br>6377 S. Revere Parkway, Suite 400<br>Centennial, Colorado 80111<br>Phone:         303-999-9000<br>Fax:             303-999-9001<br>Email:          kfalkenstein@coloradolawyers.com | Case No.:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff Nicole Cleveland, by and through her attorneys, IRWIN FRALEY, PLLC, submits this Complaint against Defendants SSC Colorado Springs Aspen Operating Company

LLC t/a Aspen Living Center, Sava SeniorCare Administrative Services LLC, and Sava SeniorCare Consulting, LLC, and in support thereof states and avers the following:

### PRELIMINARY STATEMENT

1.      This is an action pursuant to C.R.S. §§ 13-21-202, 13-21-203.5, and 13-21-203.7 and any other applicable statutes and/or regulations for solatium damages suffered by Plaintiff Nicole Cleveland ("Cleveland") as a consequence of the wrongful death of her father, William Perry ("Perry" or "Decedent"), caused by the negligence, fraud, and willful and wanton conduct of the Defendants that led to Mr. Perry's death on or about September 27, 2018.

### PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff Nicole Cleveland resides at 1322 Babcock Circle in Billings, Montana.

3.      Ms. Cleveland is the daughter of Decedent William Perry, and she is now the personal representative of Mr. Perry's estate.

4.      Defendant SSC Colorado Springs Aspen Operating Company LLC conducts business under the name Aspen Living Center ("Aspen") and is a Delaware corporation with its principle office located at 1795 Monterey Road in Colorado Springs, Colorado. Aspen is licensed to conduct business in Colorado. Aspen advertises that it provides skilled nursing care, rehabilitation services, memory and dementia care, and long term care to the public.

5.      Defendant Sava SeniorCare Administrative Services LLC ("SSAS") is a Delaware corporation with its principle office located at 1 Ravinia Drive, Suite 1500, in Atlanta, Georgia. SSAS is not licensed to conduct business in Colorado. SSAS advertises that it provides skilled nursing care, rehabilitation services, memory and dementia care, and long term care to the public. Upon information and belief, SSAS actually provides administrative support services to Sava SeniorCare facilities such as, and including, Aspen. The exact nature of these administrative support services is currently unknown to Plaintiff and will be a subject of discovery.

6.      Defendant Sava SeniorCare Consulting LLC ("SSC") is a Delaware corporation. Plaintiff was unable to ascertain where SSC's primary place of business is located but has confirmed that SSC is not licensed to conduct business in Colorado. Upon information and belief, SSC provides consulting services to Sava SeniorCare facilities such as, and including, Aspen. The exact nature of these consulting services is currently unknown to Plaintiff and will be a subject of discovery.

7.      Upon information and belief, Defendants SSAS and SSC provided the above-referenced services to Aspen both generally and specifically with regard to Mr. Perry's care.

8.      Upon information and belief, SSAS and SSC, in the course of providing those services, participated in, authorized, or were otherwise involved in the negligent acts and omissions by Aspen described herein that led to Mr. Perry's pain, suffering, and death. The exact

nature and details of the services provided by SSAS and SSC generally and with respect to Mr. Perry's care are currently unknown and will be subjects of discovery in this case.

9. This court has jurisdiction over the Defendants under the Colorado "long-arm" statute, C.R.S. § 13-1-124, in that this Plaintiff's cause of action herein arises from the Defendant's transaction of business within this state and the Defendants' commission of tortious acts within this state

10. Pursuant to C.R.C.P. 98, venue is proper in El Paso County, Colorado because El Paso County is the county in which the commission of the torts complained of herein occurred and where Defendants can be found and do business.

## NOTICE OF EXEMPTION FROM C.R.C.P. 16.1

11. Plaintiff states that this action is exempted from C.R.C.P. 16.1. Plaintiff has considered the options and potential benefits of Rule 16.1 and believes that application of the Rule to this action would not be appropriate. Plaintiff's counsel has not discussed the applicability of Rule 16.1 with counsel for Defendants as no appearance has been entered. Nevertheless, Plaintiff seeks a monetary judgment in excess of the limitations for action under Rule 16.1. Therefore, C.R.C.P. 16 shall govern this action.

## STATEMENT OF FACTS

12. On September 27, 2018, William Perry passed away at Aspen.

13. Mr. Perry had been suffering from esophageal cancer and, earlier that year, chose to enter hospice care because it had become apparent to Mr. Perry and his physician that his health was rapidly declining.

14. Mr. Perry entered a hospice program run by Compassus Hospice Care ("Compassus"), and then moved into Aspen for long-term care and to receive his hospice care.

15. Hospice is a program designed to provide palliative care and emotional and spiritual support to terminally ill patients like William Perry.

16. The reason Mr. Perry chose to enter hospice care is that he had accepted that his condition was terminal and elected a form of care designed to assure his comfort and dignity in his final days.

17. All three Defendants share SSAC's website (SavaSeniorCare.com), which advertises, *intel alia*, that

- "The staff at each of our client centers strives to provide care that encourages the health and happiness of their residents and patients. Long-term residents are welcomed into a center that embraces their needs and individuality."

3

- They "strive to provide quality health care with compassion, integrity, and respect for the residents, patients, family members, and communities they serve. Our Spirit and Commitment sets forth our expectations for employees, contractors, and volunteers."

- They "work hard to provide health care in a nurturing environment that recalls the fondest memories of home: home-cooked meals, warmth, security, and loving care."

- They provide "the type of care I would want my mom or dad to receive[.] It's that daily heart check that helps everyone to focus on quality of care. Our client centers have built a culture of caring and compassion in a comfortable environment for residents and patients.

- "All seniors deserve the best care available. That's why staff members are encouraged to ask, 'Is this the care I would want my loved ones to receive?'"

18. The SSAC website section that is specific to Aspen states, "Our center provides a variety of personalized care services to help make your stay as comfortable as possible."

19. Mr. Perry selected Aspen as his care facility in reliance on the aforesaid and/or substantially similar representations of the Defendants.

20. At the time Mr. Perry moved into Aspen for his hospice care, he expected his cancer ultimately to take his life, but he did not know how long it would take for that to happen, and his death was not imminent.

21. The hospice treatment given to Mr. Perry by Aspen was anything but palliative and supportive. He was subjected to horrific mistreatment, neglect, and humiliation that made his final days far more painful than they otherwise would have been and that ultimately hastened his death.

22. The staff of Aspen routinely left Mr. Perry for days at a time to lay in his own urine.

23. This caused Mr. Perry to develop severe pressure ulcers and horrible bed sores that were so severe that they ate though his flesh, revealing the ligaments below.

24. The stench from these pressure ulcers and bed sores was so overwhelming that it could be smelled in the front entrance area all the way down the hall from his room.

25. Nevertheless, Aspen staff did nothing to treat these horrific pressure ulcers and bed sores and instead allowed them to fester and grow.

26. These untreated pressure ulcers and bed sores ultimately caused Mr. Perry to contract and die from sepsis.

27. While at Aspen, Mr. Perry fell so many times that his cognition became compromised, which in turn limited his ability to communicate his needs.

28. Aspen staff did not take any safety measures or other actions to address Mr. Perry's repeated falls.

29. Mr. Perry's diminished mental state was documented by Aspen staff, but, again, they did nothing to help him.

30. Mr. Perry's basic needs, such as being provided with drinking water, were severely neglected by Aspen staff, often leaving him in a state of dehydration.

31. Mr. Perry also was not given his scheduled pain medication by Aspen staff as prescribed.

32. Aspen staff wrongly tried to justify this neglect by stating that they thought Mr. Perry was not to be given his regularly-scheduled prescribed medication unless he specifically asked for it.

33. Aspen was aware of all of these issues but took no corrective or disciplinary actions.

34. In fact, some of the staff dismissively stated, "Well, he's going to die anyway" or words to that effect.

35. This flippant and cynical attitude was typical of the staff at Aspen.

36. Kristi Mueller, RN was Mr. Perry's hospice nurse with Compassus and visited Mr. Perry at Aspen regularly.

37. Over time, Nurse Mueller became so horrified by the gross neglect of Mr. Perry by Aspen's staff that she reported it to Compassus' Medical Director and ultimately notified the Colorado Springs Police Department and Adult Protective Services.

38. At the time of Mr. Perry's death, a police investigation remained open.

39. Mr. Perry was discovered dead by Nurse Mueller on the night of September 27, 2018.

40. At the time of his death, Mr. Perry was found to have a body temperature of 102.2 degrees Fahrenheit, but he had not received any care or attention that evening from Aspen's staff.

41. Nurse Mueller and Mr. Perry's physician concurred that Mr. Perry had died from sepsis resulting from his pressure ulcers and horrible bed sore on his buttocks caused by Aspen staff having left him to sit in his own urine for long periods of time.

42. This horrendous neglect was the norm at Aspen.

43. After Mr. Perry's death, the El Paso County Coroner's Office conducted an investigation.

44. Aspen refused to cooperate with that investigation.

45. More specifically, Aspen refused to provide any records requested by Medical Examiner Robert C. Bux, M.D.

46. Dr. Bux's report on the circumstances surrounding Mr. Perry's death detailed the numerous ways that Aspen staff worked to obstruct his investigation by avoiding providing him the documents that they were legally required to produce to him.

47. According to Dr. Bux's report, Aspen staff "spent 8 hours of a Friday stalling."

48. As of the time that Dr. Bux issued his report, Aspen still had not provided any of those records.

49. Furthermore, according to the report issued by Dr. Bux, Aspen's staff was "very vague in the information they provided and did not appear to be completely truthful."

50. In contrast with Aspen's deliberate obstruction of Dr. Bux's investigation, Compassus immediately provided him with all requested records

51. In the course of his investigation, Dr. Bux also noted the "strong odor" emanating from Mr. Perry's pressure ulcers and bed sores.

52. Dr. Bux also noted that mouth moisteners that Nurse Mueller had left the previous day "were still sitting on the nightstand."

53. Dr. Bux's investigation also revealed that Aspen staff had failed to administer a prescribed antibiotic to Mr. Perry and then falsely claimed that no such prescription had existed.

54. Aspen's specific job was to ease William Perry's suffering, make him as comfortable as possible, and preserve his dignity in his final days.

55. Instead, Aspen's gross and inhumane neglect of Mr. Perry severely increased his pain and suffering, utterly stripped him of his dignity, and hastened his death.

56. At the time of Mr. Perry's death, he was 76 years of age.

57. Pursuant to the C.R.S. 13-25-103 mortality table, an average 76-year-old man has a life expectancy of 10.6 years. Mr. Perry's life expectancy almost certainly was shorter due to his esophageal cancer, but until he suffered the neglect of Aspen and its staff, his condition had been stable. His death did not become imminent until he contracted sepsis from his horrible pressure ulcers and bed sores that he contracted due to that horrific neglect.

58. All of the Defendants herein purport to understand how to care for the elderly and for dying patients who have opted into hospice care, as reflected in the Defendants' aforesaid representations on their website.

59. When it came to Mr. Perry, Defendants' care was far from that advertised on their website. The care provided to him emphatically was not "the best care available," was provided with an utter lack of "compassion, integrity, and respect," and certainly did not "recall the fondest memories of home."

60. Mr. Perry relied on the Defendants' false representations to his extreme detriment, up to and including his premature death.

61. As a result of the foregoing, which led to the wrongful death of Mr. Perry, Plaintiff has suffered solatium damages as set forth in more detail below.

## FIRST CLAIM FOR RELIEF
(Negligence Resulting in Wrongful Death – All Defendants)

62. Plaintiff hereby incorporates all preceding paragraphs of this Complaint as though fully set forth herein.

63. At all times relevant hereto, William Perry was under the care and treatment of the Defendants' staffs.

64. Defendants are vicariously liable for the negligent acts and omissions of their agents and/or employees and are directly liable for their own negligent failures in training, policies, management, and practices.

65. Defendants had duties to Plaintiff and her decedent and/or to her through her decedent to provide reasonable care and treatment to Mr. Perry, to exercise reasonable care in the training and supervision of its employees, to provide proper equipment, to follow ordered treatments and care plans, to provide sufficient staff to properly supervise residents, to maintain sanitary and comfortable living conditions for their patients, including Mr. Perry, and to prevent resident falls.

66. Defendants breached their duties and proximately caused injury and death to William Perry.

67. As set forth herein, employees and agents of Defendants, while acting within the scope of their employment, variously committed the complained of negligent, fraudulent, and willful and wanton acts and omissions with respect to the care and treatment of William Perry.

68. Defendants' staffs variously had nursing-patient relationships and/or other therapeutic-care relationships with William Perry at all times pertinent to this Complaint.

69. More particularly, Defendants, as owners and management of Aspen, owed Plaintiff and her decedent, William Perry, duties of due care, including but not limited to

    A. A duty to consistently monitor residents' fall risk and to devise fall-risk-mitigation and fall-prevention care plans which are sufficient and effective at preventing resident falls and accidents in circumstances like these;

    B. A duty to actually implement the various components of these fall-risk-mitigation and fall-prevention care plans;

    C. A duty to reassess and progressively change and modify fall-risk-mitigation and fall-prevention care plans;

    D. A duty to provide and use safety equipment such as pressure alarms, mats, low beds, bed rails, and other assistive devices as necessary to mitigate fall risk and prevent resident accidents including falls;

    E. A duty to provide sufficient staff supervision and care planning to prevent resident falls;

    F. A duty to provide sufficient staff and staff training;

    G. A duty to maintain healthy and sanitary living conditions for all patients, including William Perry, including but not limited to ensuring that they have clean and sanitary linens at all times;

    H. A duty to regularly monitor, examine, and evaluate the physical, mental, and emotional health of all patients, including William Perry, and take appropriate action to address any issues discovered, including, but not limited to, notifying and seeking the assistance of doctors and nurses when medically warranted;

    I. A duty to take all reasonable actions to keep hospice patients, like and including William Perry, comfortable and minimize their pain and discomfort;

    J. A duty to respect and ensure the dignity of all patients, including William Perry;

    K. A duty to comply with all applicable laws and regulations;

    L. A duty to cooperate with any and all official government investigations into allegations of wrongdoing or mistreatment of patients, especially when that mistreatment caused the patient's extraordinary pain and suffering and led to the patient's death.

    M. A duty to timely and properly report significant changes of condition and falls to family and physician alike and seek their input and orders;

  N. A duty not to admit or retain residents whose needs Defendants and their staff know they have no intention or ability to meet within their staffing and resources;

  O. A duty to refrain from and protect residents from neglect;

  P. A duty to be honest and forthright with all patients and prospective patients in all communications, whether public or private; and

  Q. A duty to refrain from and protect residents from willful and wanton conduct by their staff or anyone else under their authority or control.

  70. Defendants' staffs breached each and every one of these managerial and ownership duties of due care to Plaintiff and the deceased by the negligent, fraud, and willful and wanton conduct set forth herein.

  71. Defendants' duties of due care and the national standards of care breached by the acts and omissions complained of herein are also informed by federal nursing home quality of care and quality of life regulations, including but not limited to 42 C.F.R. § 483.25, which states in relevant part, *inter alia*, that this facility

> must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices, including but not limited to the following:
>
> (b) Skin integrity -
>
> > (1) Pressure ulcers. Based on the comprehensive assessment of a resident, the facility must ensure that -
> >
> > > (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and
> > >
> > > (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.
>
> (d) Accidents. The facility must ensure that -
>
> > (1) The resident environment remains as free of accident hazards as is possible; and
> >
> > (2) Each resident receives adequate supervision and assistance devices to prevent accidents.

(g) Assisted nutrition and hydration. Based on a resident's comprehensive assessment, the facility must ensure that a resident –

    (2) Is offered sufficient fluid intake to maintain proper hydration and health;

(k) Pain management. The facility must ensure that pain management is provided to residents who require such services, consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences.

72. Defendants' duties of due care and the national standards of care breached by the acts and omissions complained of herein are further informed by 42 C.F.R. § 483.10, the Nursing Home Residents' Bill of Rights, which states in relevant part, *inter alia*:

(a) Residents rights. The resident has a right to a dignified existence, self-determination, and communication with and access to persons and services inside and outside the facility, including those specified in this section.

    (1) A facility must treat each resident with respect and dignity and care for each resident in a manner and in an environment that promotes maintenance or enhancement of his or her quality of life, recognizing each resident's individuality. The facility must protect and promote the rights of the resident.

(c) Planning and implementing care. The resident has the right to be informed of, and participate in, his or her treatment, including:

    (2) The right to participate in the development and implementation of his or her person-centered plan of care, including but not limited to:

        (iv) The right to receive the services and/or items included in the plan of care.

(e) Respect and dignity. The resident has a right to be treated with respect and dignity . . . .

73. The negligent, fraudulent, and willful and wanton acts and omissions by Defendants' staff, employees, and agents were a substantial and significant contributing proximate cause in the preventable and untimely death of William Perry.

74. Had Defendants, through their agents and employees, not committed the negligent, fraudulent, and willful and wanton acts and omissions outlined herein, William Perry would not have died how or when he did.

75. As a result of the aforesaid negligence, fraudulent, and willful and wanton acts and omissions of the Defendants leading to the wrongful death of Plaintiff's father, William Perry, Plaintiff seeks solatium damages pursuant C.R.S. §§ 13-21-203.5 and 13-21-203.7 as set forth in more detail below.

76. Many of the acts and omissions of the Defendants set forth herein constitute fraud and willful and wanton conduct. Furthermore, the Defendants have a long history of such negligence, fraud, and willful and wanton conduct and, upon information and belief, have continued the conduct set forth herein in a willful and wanton manner against other people and will continue to do so during the pendency of this case. Plaintiff therefore reserves the right to seek leave of Court to add claims for exemplary damages on these bases and any other bases that might be learned through discovery pursuant to C.R.S. §§ 12-21-203(3) and (5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court provide her with the following relief:

A. Solatium damages in the amount mandated under C.R.S. §§ 13-21-203.5 and 13-21-203.7 (or any successor or applicable statute), as periodically declared by the Colorado Secretary of State pursuant to such statutes, as of the date of judgment. (At the time of the filing of this action, the statutory award for solatium damages is $114,370, but Plaintiff seeks the amount of damages mandated under the aforesaid statutes as of the date of judgment.)

B. Pre-judgment and post-judgment interest on such award of damage at the legal rate as provided by Colorado law, including but not limited to C.R.S. § 13-21-101;

C. Plaintiff's court and litigation costs;

D. Any declaratory, legal, or equitable relief that the Court deems just and necessary under the circumstances; and

E. Any other relief available to Plaintiff by law.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  August 19, 2020                              Respectfully submitted,

                                                     IRWIN FRALEY, PLLC

                                                     *s/ Ken Falkenstein*
                                                     Ken Falkenstein

                                                     **Attorneys for Plaintiff**

*This pleading was filed with the Court through the Colorado ICCES Electronic Filing System. Pursuant to C.R.C.P. 121 § 1-26, the original signed copy of this pleading is on file with IRWIN FRALEY, PLLC.*